UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

THEODORE M. ALBERTS, MARY GREENING, DARIN HOFFMAN, KEITH BUDD, LETICIA BUDD, MARIE BAKKEN, PATRICIA DOHERTY, KERRY JONES, MAVIS HIGGINS, JOSHUA HIGGINS, ROSANN KUHN, PATRICIA KENNEDY, KAREN MARTIN, TERRY SCHLICK, ANN AXLEY, DONNA WHITE, ERIC NELSON, KATHRYN STURGIS, RACHEL JOHNSON, CARLYLE PUTERBAUGH, LESLIE HERMANN, MARY NOLD, PAUL GARDNER, BILL KINGSTON, SUSAN ECKHOFF, CHRISTOPHER SMITHERMAN, JUDY STRAIN, POLLY ZODROW, DON VANG, DIANE WENDT, ARNOLD MOGER, RAEANN BLUMERS, KAREN HARRISON, LYNN DOELLE, ROBERT HENSON, SHERRY GORCOWSKI, LINDSAY COLEMAN, ANGELA BRINKMAN, ROMUALD JOSWICK, CORRINE ALBERTS, BRIDGET BENSON, ROBERT VICKER, PAMELA KELLOGG, MICHELLE SIMON, JED RANZENBERGER, JESSICA SINGER, TRACY CURFMAN, on behalf of themselves and other similarly situated individuals,

Plaintiffs,

v.

NASH FINCH COMPANY,

Defendant.

Case No. 05-CV-0887 (PJS/JJG)

MEMORANDUM OPINION
AND ORDER

J. Poage Anderson and Paul J. Lukas, NICHOLS KASTER & ANDERSON, PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiffs.

David M. Wilk and David A. Schooler, LARSON KING, LLP, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101, for defendant.

-1-

Plaintiffs formerly worked at three grocery stores owned by defendant Nash Finch Company ("Nash Finch").  Plaintiffs bring this putative class action under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101-2109, alleging that Nash Finch failed to give them 60 days' notice prior to closing the stores.  Two motions are pending before the Court:  Plaintiffs have moved for class certification, and Nash Finch has moved for summary judgment.  For the reasons set forth below, both motions are granted in part and denied in part.

## I.  BACKGROUND

Nash Finch owns approximately 70 retail grocery stores that do business under various names, including Econofoods, Family Thrift Center, and Sun Mart.  Plaintiffs all worked at one of three Econofoods stores:  the "Winona" store located at 1858 West Service Drive, Winona, Minnesota; the "North" store located at 3470 55th Street Northwest, Rochester, Minnesota; and the "South" store located at 1200 16th Street Southwest, Rochester, Minnesota.  Nash Finch opened South in 1984, Winona in 1989, and North in 1999.  Hess Aff. ¶¶ 3, 5, 7, Aug. 31, 2006 ("Hess Aff.").[1]  North and South are approximately six miles apart, and Winona is over 50 miles from either North or South.  Anderson Aff. Exs. 1, 2, 3, Sept. 28, 2006.  As discussed below, employees from one Econofoods store occasionally worked at other Econofoods stores, particularly in the case of the two Rochester stores.  The parties refer to an employee's primary place of employment as his or her "home store."

---

[1]In paragraph 3 of his affidavit, Gregory Hess, Nash Finch's manager of corporate retail accounting, states that "Nash Finch began operating a store at 1200 16th Street in Rochester, Minnesota, in 1984.  Beginning in 1999, Nash Finch operated the Rochester South Econofoods store at that location."  The Court understands this to mean that Nash Finch continuously operated a grocery store at the South location from 1984 to 2004.

On May 19, 2004, Nash Finch announced that it would close 21 underperforming grocery stores in six different states, including the two Rochester stores.  Eulberg Aff. ¶ 3, July 29, 2005 ("Eulberg Aff.").  North was closed on June 8, 2004, and South was closed one day later.[2]  Hess Aff. ¶¶ 4, 6.  Winona was closed over seven months later, on January 22, 2005.  Eulberg Aff. ¶ 5. It is undisputed that Nash Finch did not provide 60 days' notice under the WARN Act to employees at any of the three stores.

Nash Finch contends that it was not required to give notice under the WARN Act because none of the stores employed enough full-time workers to trigger the Act's notice requirement. Plaintiffs argue that the number of full-time employees at each store should be combined for the purpose of determining whether Nash Finch violated the Act.

## II.  SUMMARY JUDGMENT

### A.  *Standard of Review*

A party is entitled to prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, a court must consider the nonmoving party's evidence to be true and draw all justifiable inferences arising from the evidence in that party's favor.  *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

---

[2]On page 3 of their memorandum in opposition to Nash Finch's motion for summary judgment, plaintiffs state that North closed on June 9 and South closed on June 8, but cite nothing in the record in support of their assertion.  The Court therefore relies on the dates as they appear in Hess's affidavit.  For purposes of the current motions, it does not matter whether North closed one day before or one day after South.

*B.  The WARN Act*

The WARN Act requires employers to provide 60 days' notice of a plant closing or mass layoff to the employees who will be affected by the closing or layoff.  29 U.S.C. § 2102(a)(1).  Plaintiffs do not contend that they are the victims of a mass layoff.  Instead, they argue that Nash Finch's closing of the three grocery stores at which they worked qualified as a "plant closing" for purposes of the Act.

The WARN Act defines a "plant closing," in relevant part, as "the permanent or temporary shutdown of a single site of employment, . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees[.]"  29 U.S.C. § 2101(a)(2).  Because none of the three Econofoods stores employed 50 or more full-time workers, plaintiffs can prevail only if at least two of the three stores are considered to be a "single site" for purposes of the WARN Act.

Location is a critical factor in determining whether two facilities are a single site under the WARN Act.  "As a general rule, . . . geographically separate facilities are separate sites." *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996); *see also Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1110 (6th Cir. 1996) ("[G]eographical considerations are the strongest factors in determining whether separate facilities . . . are considered single or separate sites under the Act."); *Frymire v. Ampex Corp.*, 61 F.3d 757, 766 (10th Cir. 1995) ("[P]roximity and contiguity are the most important criteria for making single site determinations."); *McClain v. Laurel Street Art Club, Inc.*, 925 F. Supp. 496, 498-99 (E.D. Ky. 1995) ("[T]he statute is to be narrowly construed in favor of finding separate sites of employment where there is geographical separation."), *aff'd*, 106 F.3d 401 (6th Cir. 1997)

(unpublished table decision).  Thus, because the three Econofoods stores were separated by six miles (in the case of North and South) or 50 miles (in the case of Winona and the other two stores), the presumption is that none of the stores combined with another to form a single site for purposes of the WARN Act.

That presumption is rebuttable, though.  Geographically separate facilities may be considered a single site under the WARN Act "if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment."  20 C.F.R. § 639.3(i)(3). For example, when an employer "manages a number of warehouses in an area but . . . regularly shifts or rotates the same employees from one building to another," the warehouses will be considered a single site.  *Id.*  This exception to the general rule is limited, however, to the "rare situations in which two separate buildings share staff, equipment and functions" to such an extent that there is an "inextricable operational connection" between the sites.  Department of Labor ("DOL") Comments, 54 Fed. Reg. 16042, 16049-50 (Apr. 20, 1989); *see also Rifkin*, 78 F.3d at 1281 (explaining that "sharing of staff and equipment, and sharing the same operational purpose are appropriate criteria for determining whether two non-contiguous sites comprise a 'single site' under the WARN Act").

Common ownership is not sufficient in itself to render two separate facilities a single site under the WARN Act.  *Rifkin*, 78 F.3d at 1280.  Thus, "assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers."  20 C.F.R. § 639.3(i)(4).  Even the occasional sharing of staff between separate facilities is not sufficient to bring them within the single-site exception.  DOL Comments, 54 Fed. Reg. at 16049-50; *cf. Viator v. Delchamps Inc.*, 109 F.3d 1124, 1127-28 (5th

Cir. 1997) (evidence that up to 20% of employees were transferred to other stores on a temporary basis was insufficient to render stores a single site); *Int'l Union, United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722, 726 (11th Cir. 1993) ("While some exceptions exist, employees do not rotate among mine sites, nor do they work regularly at more than one mine."). Similarly, the fact that an employer permits cross-plant bumping, or transfers workers among geographically separate facilities, does not render the facilities a single site.  DOL Comments, 54 Fed. Reg. at 16050.  Nor is obtaining supplies from a common source considered a sufficient "operational connection" to trigger the exception. *Id.* at 16049-50.  Yet each of these factors, though not determinative, is certainly relevant in determining whether two facilities are a single site for purposes of the WARN Act.

### 1.  Winona

Nash Finch argues that even if the three Minnesota stores can be considered a single site, Nash Finch was not required to provide notice to Winona employees under the WARN Act because Winona closed on January 22, 2005, more than seven months after the two Rochester stores closed.  As noted above, a "plant closing" is the shutdown of "a single site of employment, . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees[.]"  29 U.S.C. § 2101(a)(2).  To reach the 50-employee threshold, plaintiffs may aggregate all employment losses occurring in any 90-day period at a single site "unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of [the WARN Act]."  29 U.S.C. § 2102(d).

Because the layoffs in Winona did not occur within 90 days of the Rochester layoffs, and because it is undisputed that there were fewer than 50 full-time employees at Winona, the closing of Winona was not a "plant closing" for purposes of the WARN Act. Nash Finch's motion for summary judgment is therefore granted with respect to plaintiffs who worked at the Winona store.

## 2. Rochester North and South

Sixty days prior to closing, South employed approximately 36 full-time workers and North employed approximately 38. Eulberg Aff. ¶ 17; *see also* Blumers Dep. 54 (identifying South as store # 337 and North as store # 342). Although North and South were approximately six miles apart, plaintiffs contend that they should be considered a single site of employment under the WARN Act because the stores shared staff, equipment, and inventory.

The parties have been well-represented in this proceeding, and both sides have provided extensive arguments and evidence concerning specific employees, specific equipment, and specific inventory. In general, Nash Finch presents evidence that the sharing between North and South was sporadic and constituted a small percentage of the total hours worked, equipment used, and inventory stocked. Plaintiffs present quite a different view. Many of them testified that, while Nash Finch may have had policies in place that treated the stores as separate sites, in reality employees, equipment, and inventory flowed freely back and forth between the stores, often without proper documentation.

The Court has carefully considered all of this evidence in the light most favorable to plaintiffs. Although the Court is skeptical that plaintiffs will ultimately prevail on the single-site

issue, the Court concludes that the evidence regarding the sharing of employees, equipment, and inventory is sufficiently disputed to preclude summary judgment.

### a. Sharing of Employees

Nash Finch compares this case to *Viator*, in which the Fifth Circuit held that three grocery stores could not be considered a single site despite evidence that up to 20% of the combined workforce had been transferred between stores on a temporary basis. *Viator*, 109 F.3d at 1127-28. There are indeed similarities between *Viator* and this case, but there are also important distinctions.

For example, plaintiffs identify approximately 40 Rochester employees who worked at both stores at least occasionally, which is more than half of the combined full-time Econofoods workforce, and more than double the percentage of shared employees in *Viator*. *See* Pls.' Mem. Opp. Summ. J. 6-10 (summarizing evidence of employees who worked at different stores). Moreover, the shared employees in *Viator* were transferred on a temporary basis for short periods of time. *See* 109 F.3d at 1127-28. Here the evidence demonstrates that certain employees were shared extensively between the two stores for extended periods of time, and that one employee (Herman Raboin) managed both stores for several months. *See, e.g.*, Axley Dep. 50 (Herman Raboin managed both stores for three to four months); *id.* at 20-21, 29, 32 (Ann Axley picked up hours almost every time she was at North, which was "on a daily basis"); Alberts Dep. 44 (Shannon Keckhafer regularly worked 20 hours each week at each store); Blumers Dep. 39 (North assistant manager Donna White worked at South a couple of times per week for approximately a year); White Dep. 34-35 (Martha Mae Brennan, Seila Hodzik, and Neila Hodzik worked at both stores because their home store did not have enough hours for

them); Eckhoff Dep. 113 (Susan Eckhoff worked approximately 40 hours per month away from her home store for four years). The Court also finds it significant that, according to plaintiffs, employees could not always decline to work at another store when directed to do so. *See* White Dep. 66 ("You don't say, 'No, I'm not going to go to Red Wing because one of their managers is sick.' You go. . . . You work where we send you. You help where we need you.")

There are certainly reasons to doubt the accuracy of at least some of the testimony concerning hours worked at non-home stores. Many employees seem to overestimate the extent to which their co-workers switched between stores. For example, RaeAnn Blumers testified that Kathryn Sturgis, a North employee, worked at South a couple of times each week for "a good six months." Blumers Dep. 37-38. In contrast, Sturgis herself testified that she worked at South only two or three times per month, and for only four months. Sturgis Dep. 45-46, 54. But not all of the testimony offered by plaintiffs is contradicted in this manner, and, in any event, it is not the Court's function at this stage to resolve conflicting testimony.

Nash Finch might still be entitled to summary judgment if it could show that, notwithstanding the fact that a high number of employees of one store worked at the other store, the total number of hours worked at either store by "visiting" employees was an insignificant percentage of the whole. After the Court pointed this out at oral argument, Nash Finch provided the Court with additional evidence based on its 2003 payroll records from North and South. According to Nash Finch, this evidence indicates that North and South employees worked a combined total of 192,481.46 hours in 2003.[3] *See* Wilk Aff. Exs. 3, 5, Oct. 30, 2006 ("Wilk

---

[3]Nash Finch could not locate any payroll information for the week ending May 5, 2003. Wilk Aff. Ex. 3 at 1, Ex. 5 at 1, Oct. 30, 2006.

Aff.").  Of that total, only 3842.25 hours (or approximately 2%) were worked at a store other than the employee's home store.  *See id.*

If this evidence were undisputed, the Court would likely grant Nash Finch's motion for summary judgment.  But this evidence is not undisputed.  Plaintiffs present evidence that there are significant gaps in Nash Finch's payroll records, and plaintiffs point out that the records do not match testimony concerning hours worked at non-home stores.  *See* Sutherland Aff. Ex. 1 (Nov. 10, 2006) ("Sutherland Aff."); Pls.' Reply 3-5.  For example, a number of employees testified that Herman Raboin managed both stores for several months in 2003, yet the 2003 payroll records do not reflect this.  *See* Sutherland Aff. Ex. 1; Wilk Aff. Exs. 2, 4.  Indeed, many of the weekly reports contain no data concerning Raboin's hours.  *See* Sutherland Aff. Ex. 1; *see also, e.g.*, Wilk Aff. Exs. 2, 4 (payroll reports for weeks ending April 19 and April 26 with no hours for Raboin).  Furthermore, this evidence seems to contradict Nash Finch's contention that it scrupulously tracked and allocated hours to ensure that each store paid for hours actually worked there.  There may well be an explanation for these discrepancies, but Nash Finch has not provided it.  If Nash Finch can better support the 2% figure at trial, Nash Finch may be entitled to judgment as a matter of law.  As the record stands, though, the Court concludes that there is a genuine dispute concerning the extent to which Rochester employees worked at non-home stores.

### b.  Equipment and Inventory

The parties also dispute the extent to which the stores shared equipment and inventory. Nash Finch portrays a system in which relatively little equipment and inventory were shared, all equipment and inventory were carefully tracked, and what little equipment was shared was

always returned to its proper place. By contrast, plaintiffs contend that employees treated both stores as a single repository of equipment and inventory, and that equipment and inventory were routinely sent where they were needed, often without proper documentation. *See, e.g.*, White Dep. 85, 94 ("[D]id product and inventory and people get shared? Yes. Was it documented the way it was properly supposed to? Not in all cases. . . . it was just like a two-way street between the two stores.").

There is evidence in the record to support both views. For example, more than one employee testified that Nash Finch specifically declined to purchase additional catering equipment for one Rochester store because the two Rochester stores together had enough catering equipment and could share. Axley Dep. 92-95; Wendt Dep. 78-79. At some point, the North bakery began supplying both stores. Axley Dep. 36; White Dep. 110. The stores regularly transferred prescriptions and film between them, depending on which store was best able to fill the prescription or develop the film at the moment. Smitherman Dep. 73-74, 81. While Nash Finch contends that inventory transfers were always documented or otherwise taken into account, a number of employees testified to the contrary. *See, e.g.*, Alberts Dep. 62-63, 65-66; Blumers Dep. 50-51; Eckhoff Dep. 60, 63-65, 70; White Dep. 93-94. Ultimately, there is just too much conflicting testimony for the Court to determine, on this record, to what extent equipment and inventory were shared.

### c. *Operational Purpose*

The WARN Act regulations also require that geographically separate facilities share a common operational purpose in order to be considered a single site. 20 C.F.R. § 639.3(i)(3)-(4). Given the disputes over the extent to which the two stores shared employees, equipment, and

inventory, the Court finds that there is a genuine dispute concerning whether the two stores also shared an operational purpose.  Normally, one would expect grocery stores located six miles apart to serve different markets and thus different purposes.  But if the sharing was as extensive as plaintiffs contend, it is possible that the stores shared the common purpose of together serving the Rochester retail grocery market.

### 3.  Good Faith

Finally, Nash Finch argues that the Court should find that it acted in good faith when it determined that the WARN Act did not require it to provide notice to employees affected by the closings of the Rochester stores.  When an employer acts in good faith and with reasonable grounds for believing that its actions did not violate the WARN Act, the Court may, in its discretion, reduce the company's liability.  29 U.S.C. § 2104(a)(4).

At this point, Nash Finch appears to have a strong argument that it acted in good faith.  The fact that this Court has had a difficult time deciding whether to grant Nash Finch's summary-judgment motion is evidence that reasonable people could conclude that the North and South stores were not a single site for purposes of the WARN Act.  But the "good faith" defense applies only after a violation of the WARN Act has been established; it is not a basis for granting summary judgment to the employer.  *Cf. Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 258 (S.D.N.Y. 1996) (employer's good-faith argument did not preclude granting summary judgment to plaintiffs because the defense applies only after a violation is established).  Moreover, there are, as described above, a number of factual disputes that must be resolved — and thus a lot of testimony that must be heard — before the Court can reach a final decision about whether Nash Finch acted in good faith.

-12-

For these reasons, Nash Finch's motion for summary judgment is denied with respect to plaintiffs who worked at one of the two Rochester stores.

## III.  CLASS CERTIFICATION

Plaintiffs ask the Court to certify a class action.  For a class to be certified, plaintiffs must meet all of the criteria of Rule 23(a) and fall within one of the categories of Rule 23(b). Plaintiffs bear the burden of showing that the class should be certified and that the requirements of Rule 23 are met.  *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).  District courts have wide discretion in determining whether certification of a class is appropriate.  *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980).

As a threshold matter, Nash Finch contends that the Court should examine the merits of plaintiffs' claims to determine whether class certification is appropriate.  Nash Finch argues, in essence, that because it is entitled to summary judgment on the merits, the Court should not certify a class.[4]  Nash Finch's argument is merely a reprise of its summary-judgment motion, which the Court has already denied.  More importantly, "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  True, a court may have to look beyond the pleadings and assess the state of the evidence in deciding whether to certify a class, but that is not the same as determining whether the putative class is likely to succeed on the merits.  *See Blades v.*

---

[4]This is a somewhat curious argument for Nash Finch to make.  If Nash Finch was truly confident in winning summary judgment, then Nash Finch should *favor* certification of a plaintiff class, as its "win" would then bind all class members, instead of just the individual plaintiffs.

*Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) (in determining whether common issues predominate, courts should resolve factual issues only to the extent necessary to determine whether the same evidence will suffice to prove the claims of all class members).  The Court will address only the question of whether plaintiffs meet the requirements of Rule 23.

### A.  Rule 23(a)

Rule 23(a) requires that the following must be established before a class may be certified:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs seek to certify a class consisting of "all employees, employed 60 days prior to closure, at Nash Finch owned grocery stores numbered 337, 342, 327, 240, 486, 405, 406, 559, 466, 510, 490 and 491."  Pls.' Mot. Class Cert. 1.  In other words, plaintiffs seek to certify a class composed not only of the former employees of North and South, but of the former employees of ten other closed Nash Finch stores, none of which (save Winona) was located in Minnesota.  *See* Pls.' Mem. Supp. Class Cert. 4 (listing locations of all 12 stores).

As the Court's analysis of Nash Finch's motion for summary judgment illustrates, determining whether North and South were a single site for WARN Act purposes depends on a detailed analysis of evidence that is specific to the two stores.  Yet, as plaintiffs conceded at oral argument, plaintiffs possess virtually no evidence concerning the out-of-state stores, and discovery is completed.  In addition, although plaintiff Susan Eckhoff (the proposed class representative) trained employees at several different Nash Finch stores, no out-of-state store

was the home store of Eckhoff or any other plaintiff.  Indeed, it is not clear from the record whether any plaintiff other than Eckhoff has ever set eyes on one of the out-of-state stores.

Plaintiffs suggest that the Court divide the class into subclasses, putting former employees of the Rochester stores in one subclass, and putting former employees of the out-of-state stores in other subclasses.  But not one of the plaintiffs would fairly and adequately protect the interests of any subclass of out-of-state employees.  *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982) (Rule 23(a) requirements must be satisfied for each proposed subclass).

For these reasons, plaintiffs' motion to certify a class is denied to the extent that it seeks to include former employees of stores located outside of Minnesota.  Because the Court has already granted summary judgment to Nash Finch with respect to Winona, plaintiffs' motion to certify is also denied to the extent that it seeks to include former employees of that store.  That leaves the two Rochester stores.

### 1.  Numerosity

The first requirement of Rule 23(a) is that members of the putative class be so numerous that joinder of all of them is impracticable.  Fed. R. Civ. P. 23(a)(1).  Courts look at the particular circumstances of each case to determine whether this requirement has been met.  *In re Select Comfort Co. Sec. Litig.*, 202 F.R.D. 598, 603 (D. Minn. 2001).  The most obvious factor, of course, is the number of potential class members.  *Paxton*, 688 F.2d at 559.  Other relevant factors include the nature of the action, the size of individual claims, the inconvenience of trying individual suits, and any other factor that sheds light on the practicability of joining all putative class members.  *Paxton*, 688 F.2d at 559-560.

In general, a putative class exceeding 40 members is sufficiently large to make joinder impracticable.  *See Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995).  The former employees of the two Rochester stores make up a putative class of about 74 people.  At oral argument, plaintiffs indicated that the class may be even larger, as part-time workers are eligible for relief under the WARN Act even though they do not count towards the 50-employee threshold.  *See* 20 C.F.R. § 639.6(b) ("While part-time employees are not counted in determining whether plant closing or mass layoff thresholds are reached, such workers are due notice.").  Thus, the putative class appears to meet the numerosity requirement.

Nash Finch argues, though, that joinder is not impracticable because over 30 plaintiffs (excluding those from Winona) have already joined this litigation, and the names and addresses of the other putative class members are readily ascertainable.  Nash Finch also points out that the WARN Act gives the Court discretion to award attorney's fees to the prevailing party, 29 U.S.C. § 2104(a)(6), and thus there is no barrier to potential plaintiffs bringing individual claims, even if those claims are relatively small.

The Court is not persuaded.  The class is surely not enormous, but it is large enough that joinder of all members would be unwieldy.  As for attorney's fees, there is no guarantee that a successful plaintiff would recover his or her fees.  The statute permits, but does not require, the Court to award such fees — and, even if the Court decides to award some fees, it does not have to award the full amount owed by the plaintiff.[5]

---

[5]Courts are also empowered to force *plaintiffs* to pay the fees of successful *defendants*. *See, e.g., Solberg v. Inline Corp.*, 740 F. Supp. 680, 687 (D. Minn. 1990) (declining, under the facts of the case, to award attorney's fees to the prevailing defendant under the WARN Act); *In re Arrow Transp. Co.*, 224 B.R. 457, 464 (Bankr. D. Or. 1998) (awarding attorney's fees to a prevailing defendant under the WARN Act).

This case is thus distinguishable from *Jones v. CBE Group, Inc.*, in which Judge Doty held that, because the Fair Debt Collection Practices Act ("FDCPA") provides for fee-shifting (*see* 15 U.S.C. § 1692(k)), class certification was not a superior means of adjudicating the claims. *See Jones*, 215 F.R.D. 558, 570 (D. Minn. 2003). Unlike the WARN Act's fee-shifting provision, the FDCPA's fee-shifting provision is mandatory. *See* 15 U.S.C. § 1692k(a)(3) (stating that a person in violation of the statute "is liable" for attorney's fees to a successful plaintiff); *Zagorski v. Midwest Billing Servs., Inc.*, 128 F.3d 1164, 1166 (7th Cir. 1997) (per curiam) ("[T]he award of attorney's fees to plaintiffs for a debt collector's violation of 'any provision' of the FDCPA is mandatory."); *Hennessy v. Daniels Law Office*, 270 F.3d 551, 553 (8th Cir. 2001) (citing *Zagorski*). Obviously, a mandatory fee-shifting provision (such as the FDCPA's) militates more strongly against class certification than a discretionary fee-shifting provision (such as the WARN Act's).

WARN Act claims are also suited for class treatment in a way that claims under the FDCPA are not. *See Kelly v. SabreTech Inc.*, 195 F.R.D. 48, 54 (S.D. Fla. 1999). As described above, the WARN Act applies only when an employer's course of conduct affects a group of employees. In cases such as this, when the issue is whether two facilities should be combined to meet the statute's 50-employee threshold, the class will by definition be relatively small (usually around 100), yet the determinative issue is identical for all class members, and it would be inefficient to try that issue over and over again.

Nash Finch finally points out that no other potential class members have thus far shown any interest in joining this case. But that hardly supports an inference that joinder is practicable; indeed, it would seem to indicate the opposite. It is possible that potential class members have

-17-

concluded that, notwithstanding the attorney's fees provision, the amount at stake for any one individual does not justify even the non-monetary burdens of litigation.  The Court therefore concludes that the putative class meets Rule 23(a)'s numerosity requirement.

### 2.   Commonality

The second prerequisite for class certification is that there be questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  "Rule 23(a)(2) requires that there be common questions of law or fact among the members of the class.  The rule does not require that every question of law or fact be common to every member of the class[.]"  *Paxton*, 688 F.2d at 561. The claims of plaintiffs here obviously share a common legal question — Were the two Rochester stores a single site for purposes of the WARN Act? — and they share many factual questions relevant to that common legal question.  The putative class easily meets the commonality requirement.

### 3.   Typicality

The third requirement of Rule 23(a) is that the claims or defenses of the proposed class representative are typical of the claims or defenses of the rest of the proposed class.  Fed. R. Civ. P. 23(a)(3).  "Typicality is satisfied when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members."  *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329 (D. Minn. 2005).

Plaintiffs originally proposed Theodore Alberts as the class representative.  In response to Nash Finch's argument that Alberts would not be an adequate representative, plaintiffs have proposed Susan Eckhoff as a substitute.  Eckhoff's claims appear to be typical of those of the other class members.  Her original home store was South.  Eckhoff Dep. 7, 9-10.  In 2000, she

switched to North.  Eckhoff Dep. 22.  She lost her job when North was closed.  She did not

receive notice under the WARN Act.  And, like all other class members, she cannot recover from

Nash Finch unless she proves that North and South were a single site for purposes of the WARN

Act.  The proposed class representative clearly meets the commonality requirement.[6]

### 4.  Adequacy

The final requirement of Rule 23(a) is that the representative parties must "fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To meet this requirement,

plaintiffs must show that (1) the class representative and her attorneys are able and willing to

litigate the action competently and vigorously, and (2) the class representative's interests are

sufficiently similar to those of the rest of the class members that her goals and viewpoints will

not diverge from those of the class.  *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D. Minn.

1995).

Nash Finch argues that Eckhoff is not an adequate class representative because she has

already given testimony that is antagonistic to the interests of the class.  Specifically, Nash Finch

---

[6]Nash Finch contends that it would be prejudiced if the Court permitted the substitution
of Eckhoff for Alberts because discovery has closed and, although Nash Finch deposed Eckhoff,
it did not question her about "class matters."  Presumably, Nash Finch means that it did not get
the chance to explore whether Eckhoff would be an adequate class representative because, at the
time she was deposed, she was not the proposed class representative.

The Court is doubtful that such discovery is necessary.  Nash Finch does not contend —
and the record does not indicate — that Eckhoff has asserted unique claims or is facing unique
defenses such that her posture in this litigation is materially different from the posture of the
other class members.  Nevertheless, because Nash Finch did not have the motive to explore this
issue fully at Eckhoff's deposition, the Court will permit Nash Finch to take a second deposition
of Eckhoff within 45 days after entry of this order.  The deposition is limited to one hour and to
questions that relate directly to Eckhoff's ability to serve as the class representative.

points to testimony from Eckhoff that would support a finding that the two Rochester stores operated independently of each other.

The Court is unaware of any case law — and Nash Finch has pointed to none — holding that only class members who have given no testimony that could be used against the class can fairly and adequately protect the interests of the class. Class representatives are commonly deposed, and it is a rare class representative who does not give a single sentence of testimony that might help the class's adversary. Indeed, *most* members of a plaintiff class who are deposed will say something that benefits the defendant in some way.

Like every member of the putative class, Eckhoff witnessed some behavior and practices that tend to support Nash Finch's claim that the two Rochester stores were run independently and other behavior and practices that tend to support plaintiffs' claim that they were not. What is important is that Eckhoff, like every other class member, cannot recover under the WARN Act unless she proves that the two stores were a single site of employment. Eckhoff is challenging the same conduct, relying on the same evidence, and seeking the same type of relief as every other class member. There is no reason to doubt that she will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Nash Finch has not raised any concern over proposed class counsel. The Court has examined counsel's background and qualifications and is fully satisfied that he will prosecute this action competently and vigorously. Accordingly, the putative class meets the commonality requirement, and all of the Rule 23(a) prerequisites for class certification are satisfied.

*B. Rule 23(b)(3)*

Plaintiffs move for certification under Rule 23(b)(3), which provides that a class action

may be maintained if

> the court finds that the questions of law or fact common to the members of the
> class predominate over any questions affecting only individual members, and that
> a class action is superior to other available methods for the fair and efficient
> adjudication of the controversy.  The matters pertinent to the findings include:
> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation
> concerning the controversy already commenced by or against members of the
> class; (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; (D) the difficulties likely to be encountered in the
> management of a class action.

Fed. R. Civ. P. 23(b)(3).

In this case, the dominant issue is whether the two Rochester stores were a single site of

employment for purposes of the WARN Act.  If they were not, the case is over, and there are no

other issues to be decided.  If they were, the only remaining issues are whether class members

are "aggrieved employee[s] who suffer[ed] an employment loss" within the meaning of the

WARN Act, *see* 29 U.S.C. § 2104(a)(1), whether Nash Finch acted in good faith, and damages.

Nash Finch objects that the proposed class definition is inadequate because it is not

limited to employees who experienced a covered "employment loss."  The class as defined by

the Court addresses this objection by including only employees who have "suffer[ed] an

employment loss" for purposes of the WARN Act.

The issue of Nash Finch's good faith is an issue common to all class members and easily

resolved on a class-wide basis.  And given the type of relief authorized by the WARN Act —

namely, back pay and employment benefits — determining damages should for the most part be

a matter of simple arithmetic.  *See* 29 U.S.C. 2104(a).  The Court therefore concludes that issues

common to the class predominate over individual issues.

The Court also has no difficulty in concluding that class treatment is a superior method of

adjudication in this case.  Each class member's claim is likely to be relatively small, yet

determining whether the two Rochester stores were a single site of employment requires

extensive evidence from many employees concerning the operation of both stores.  As discussed

above, the possibility of fee shifting does not appreciably alter the analysis.  Nor will proceeding

as a class limit any particular class member's ultimate recovery.  *Cf. Bryant v. Bonded Account*

*Serv./Check Recovery, Inc.*, 208 F.R.D. 251, 261 (D. Minn. 2000) (concluding that the plaintiff

did not meet the superiority requirement because proceeding as a class action could limit absent

class members' recovery).  Under these circumstances, it is clearly more efficient to consolidate

all of the evidence and parties into one action.

Plaintiffs' motion for class certification is granted with respect to former employees of

the two Rochester stores.  The Court will certify under Rule 23(b)(3) a class consisting of all

those who were employed by either of the two Rochester stores 60 days prior to the closing of

those stores.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.       Defendant's motion for summary judgment [Docket No. 61] is GRANTED with

respect to all claims of plaintiffs listed in Paragraph 10 of plaintiffs' second amended complaint

[Docket No. 70].  Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

Defendant's motion is DENIED in all other respects.

      2.     Plaintiffs' motion for class certification [Docket No. 46] is GRANTED with

respect to a class defined as follows:  (1) all those who were employed at Nash Finch-owned

grocery store number 337 60 days before it closed and who "suffer[ed] an employment loss" for

purposes of the WARN Act; and (2) all those who were employed at Nash Finch-owned grocery

store number 342 60 days before it closed and who "suffer[ed] an employment loss" for purposes

of the WARN Act.  Pursuant to Fed. R. Civ. P. 23(g), the Court appoints J. Poage Anderson to

represent the class.  Plaintiffs' motion is DENIED in all other respects.

      3.     Within 30 days from the date of this Order, class counsel shall file and serve a

proposed form of notice to class members that complies with the requirements of Fed. R. Civ. P.

23(c)(2)(B).  Within 10 days from the date class counsel files and serves the proposed form of

notice, defendant shall file and serve any objections to that proposed form of notice.

Dated:  February  15 , 2007                 s/Patrick J. Schiltz           
                                           Patrick J. Schiltz
                                         United States District Judge